## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BOOMI, INC.,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. |
| **BRIAN MOZHDEHI and CODEUTILITY, LLC,** | **COMPLAINT** **JURY TRIAL DEMANDED** |
| **Defendants.** | |

USDC-EDPA
REC'D CLERK
05 NOV -4  PM 6:40

Plaintiff Boomi, Inc. ("Boomi" or the "Company"), by and through its undersigned counsel, hereby makes the following Complaint against Defendants Brian Mozhdehi and CodeUtility, LLC (collectively, "Defendants"), and in support thereof aver as follows:

### THE PARTIES

1.      Boomi is a Pennsylvania corporation with its principal place of business at 625 West Ridge Pike, Building E, Suite 201, Conshohocken, PA 19428.

2.      Defendant Brian Mozhdehi ("Mozhdehi") is an individual who, upon information and belief, resides at 630 Pugh Road, Wayne, PA 19087-1909.

3.      Defendant CodeUtility, LLC ("CodeUtility") is a limited liability company with a registered address of 746 Bainbridge Street, Philadelphia, PA 19147, and, upon information and belief, presently doing business at 630 Pugh Road, Wayne, PA 19087-1909.  Upon information and belief, Defendant CodeUtility is owned and controlled by Defendant Mozhdehi.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338 (jurisdiction to adjudicate claims of federal copyright infringement); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

5.     Venue is proper under 28 U.S.C. §§ 1391(b) and 1400(a).

## FACTS

### I.   Boomi And Defendant Mozhdehi's Relationship With Boomi

6.     Founded in March of 2000, Boomi develops and markets business-to-business ("B2B") and application integration software, and provides related consulting, development and training services. Specifically, Boomi develops, markets and sells software applications designed to facilitate the exchange of information between disparate enterprise applications.

7.     Defendant Mozhdehi is one of Boomi's original co-founders and served as an officer of Boomi and on its Board of Directors from its inception.

8.     In or about April of 2002, Defendant Mozhdehi and Boomi entered into an Employment Agreement pursuant to which Defendant Mozhdehi agreed to serve as Boomi's Chief Executive Officer.

### II.   Boomi's Development Of The Proprietary Custom Load Planner Software

9.     In or about October of 2003, Boomi agreed to develop for one of its customers, Saddle Creek Corporation ("SCC"), a customized software application ("Custom Load Planner") which would manage the orders received from SCC's customers and plan the loads and shipments of product to these customers. Among other things, the Custom Load Planner enabled the user to manage and edit storers, sku numbers, and orders. SCC deemed this customized product as a competitive advantage in its industry.

10.     Boomi developed the Custom Load Planner on or before January 2004.

2

11.     In January of 2004, the Custom Load Planner was delivered to SCC.

### III.     The Separation Agreement

12.     Thereafter, in or about February of 2004, Boomi and Defendant Mozhdehi decided that it would be in their mutual best interests to sever Defendant Mozhdehi's employment relationship with Boomi.

13.     On or about February 20, 2004, Boomi and Defendant Mozhdehi entered into a Separation Agreement and General Release ("Separation Agreement") in which Boomi and Defendant Mozhdehi agreed that Defendant Mozhdehi's employment would end on February 29, 2004 (the "Termination Date").  A copy of the Separation Agreement is attached as Exhibit A.

### A.     Consideration Paid By Boomi To Defendant Mozhdehi

14.     In exchange for the performance of Defendant Mozhdehi's obligations under the Separation Agreement, Boomi agreed:

a.     To pay Defendant Mozhdehi severance totaling $100,000 in six (6) monthly installments beginning September 1, 2004, provided there was no change in control before August 15, 2004;

b.     To waive its right, pursuant to a Shareholders' Agreement between Boomi and Defendant Mozhdehi dated August 29, 2001, to repurchase securities held by Defendant Mozhdehi; and

c.     To enter into a Professional Services Agreement with Defendant Mozhdehi.

### B.     Defendant Mozhdehi's Obligations Under The Separation Agreement

15.     In exchange for the consideration from Boomi, Defendant Mozhdehi agreed, among other things:

a.     To release Boomi from any and all claims up to and including his Termination Date;

b.     To assign all of his right, title and interest in any and all inventions, discoveries, designs, developments, improvements, copyrightable material, and trade secrets that he solely or jointly may have conceived, developed, authored,

reduced to practice or otherwise produced during his employment with Boomi; and

c.     To abide by his obligations relating to non-disclosure of confidential information, return of company property, non-solicitation of customers and non-competition provided in paragraph 7 of the Separation Agreement.

16.     In paragraph 7.e. of the Separation Agreement, Defendant Mozhdehi further agreed that the restrictions outlined in paragraph 7 "are reasonable and necessary protections of the immediate interests of the Company and that the Company would not have entered into this Agreement without receiving additional consideration offered by Mr. Mozhdehi in binding himself to these restrictions."

17.     In paragraph 7.a. of the Separation Agreement, Defendant Mozhdehi specifically acknowledged:

that his employment by the Company has brought him into close contact with many confidential affairs of the Company, including, without limitation, information about costs, profits, markets, sales, products, intellectual property, key personnel, pricing policies, operational methods, technical processes, strategic plans and other business affairs and methods and other information not readily available to the public (collectively, "Confidential Information"). Mr. Mozhdehi further acknowledges that the services that he rendered and continues to render to the Company are of a special, unique, unusual, extraordinary and intellectual character.

18.     In paragraph 7.a(2) of the Separation Agreement, entitled "Return of Company Property and Confidential Information," Defendant Mozhdehi also agreed to:

deliver promptly to the Company or immediately after the Termination Date, or at any other time the Company may so request, at the Company's expense, all documents containing Confidential Information and all other property of the Company, which Mr. Mozhdehi obtained while employed by, or otherwise serving or acting on behalf of, the Company and which he may then possess or have under his control.

19.     In paragraph 7.b. of the Separation Agreement, entitled "Non-Compete," Defendant Mozhdehi further agreed that:

4

he will not, directly or indirectly, without the prior written consent of a majority of the Board, for the remainder of his employment with the Company and for a period of one year following the Termination Date, own, manage, operate, join, control, receive compensation or benefits from, or participate in the ownership, management, operation, or control of, or be employed or be otherwise connected in any manner with, any business in North America or Europe, which directly or indirectly competes (as defined in the following sentence) with the business of the Company or any of its subsidiaries or affiliates, as conducted or planned by the Company or any subsidiary or affiliate during my employment. . . .

20.     Paragraph 7.b. of the Separation Agreement defined "competes" to mean –

the development, production, marketing or sale of any business to business integration software and/or services and enterprise application integration software and/or services or other product or service discovered, developed, produced, marketed or sold by the Company (or to Mr. Mozhdehi's knowledge was under development by the Company or any of its subsidiaries or affiliates) during Mr. Mozhdehi's employment for any person other than the Company or its subsidiaries or affiliates.

21.     In Paragraph 7.c. of the Separation Agreement, entitled "Solicitation of Customers," Defendant Mozhdehi also agreed:

For the remainder of Mr. Mozhdehi's employment with the Company and for a period of one year following the Termination Date, Mr. Mozhdehi, directly or indirectly, will not seek Prohibited Business from any Customer (as defined below) on behalf of any enterprise or business other than the Company, refer Prohibited Business from any Customer to any enterprise or business other than the Company or receive commissions based on sales or otherwise relating to the Prohibited Business from any Customer, or any enterprise or business other than the Company.

22.     Paragraph 7.c. of the Separation Agreement defined "customer" to include:

any person, firm, corporation, partnership, association or other entity to which the Company or any of its affiliates sold or provided goods or services during the 24-month period prior to the time at which any determination is required to be made as to whether any such person, firm, corporation, partnership, association or other entity is a Customer.

23.     Paragraph 7.c. of the Separation Agreement, in turn, defined "Prohibited Business" to mean:

the development, production, marketing or sale of any business to business integration software and/or services and enterprise application integration

5

software and/or services or other product or service discovered, developed, produced, marketed or sold by the Company (or to Mr. Mozhdehi's knowledge was under development by the Company or any of its subsidiaries or affiliates) during Mr. Mozhdehi's employment for any person other than the Company or its subsidiaries or affiliates.

## IV.   The Professional Services Agreement

24.    Contemporaneous with the execution of the Separation Agreement, on or about February 20, 2004, Boomi and Defendant Mozhdehi entered into a Professional Services Agreement and General Release ("Professional Services Agreement") in which Boomi and Defendant Mozhdehi agreed that effective March 1, 2004, Defendant Mozhdehi would serve as an independent contractor and provide Boomi and/or Boomi customers certain programming, consulting and/or system services pursuant to certain terms and conditions.  A copy of the Professional Services Agreement is attached as Exhibit B.

25.    In paragraph 6 of the Professional Services Agreement, Defendant Mozhdehi reaffirmed his non-disclosure obligations in the Separation Agreement and agreed that they would "extend for a period of three (3) years following the termination of this Professional Services Agreement."

26.    In paragraph 7 of the Professional Services Agreement, Defendant Mozhdehi similarly reaffirmed his non-competition and non-solicitation obligations in the Separation Agreement and agreed that they would "extend for a period of one (1) year following the termination of this Professional Services Agreement."

27.    The Professional Services Agreement provided for an initial term of March 1, 2004 through May 1, 2004, which "automatically extended upon the same terms and conditions unless proper termination or cancellation was received."

28.     Except in cases of death, disability or when Defendant Mozhdehi had not completed his obligations with respect to a customer project, either party could terminate the Professional Services Agreement by giving fifteen (15) days prior written notice.

## V.     The First Amendment To The Separation Agreement

29.     In or about August of 2004, Boomi and Defendant Mozhdehi entered into a First Amendment To Separation Agreement And General Release ("First Amendment"). A copy of the Amendment is attached as Exhibit C.

30.     Pursuant to the First Amendment, Boomi and Defendant Mozhdehi agreed that Defendant Mozhdehi would receive severance of $75,000 in a lump-sum to be paid on or before August 31, 2004, rather than $100,000 paid in six (6) monthly installments beginning September 1, 2004, as forth in the Separation Agreement.

31.     With the exception of the timing and amount of Defendant Mozhdehi's severance, the parties agreed that the Separation Agreement would "remain in full force and effect as currently written," including but not limited to Defendant Mozhdehi's non-disclosure, non-competition and non-solicitation obligations.

## VI.     The Defendants' Misconduct

32.     In or about May 4th, 2004, Boomi received a request from an existing customer, Standard Corporation ("Standard"), for a software application similar or identical to the Custom Load Planner developed by Boomi for SCC.

33.     Boomi informed Standard that it could not share the Custom Load Planner with Standard, but that it would be willing to develop a customized application to address Standard's specific needs.

34.     In or about May 5th, 2004, Boomi submitted a bid in the amount of $32,400 to develop the customized application for Standard. Boomi received no response.

35.     In or about June 20th, 2004, Boomi received a request from SSA Global to submit a joint bid for a project at Standard that would involve the provision of B2B integration and development services.

36.     Boomi had a contract with EXE Technologies ("EXE") to provide B2B and application integration software and software maintenance and support to EXE's customers, which contract, upon information and belief, was assumed by SSA Global.  Upon information and belief, SSA Global, in turn, had a contractual and/or business relationship with Standard to provide, among other things, such software, maintenance and support to Standard.

37.     In or about June 22th, 2004, Boomi submitted a bid in the amount of $22,400 to complete the B2B integration project for Standard in partnership with SSA Global.   Boomi received no response.

38.     In or about July 2004, Boomi inquired of Standard as to the status of its bids. Standard informed Boomi that it had accepted the bid of another developer for the customized application and the B2B integration project.

39.     In or about October 18th 2004, Boomi received a routine service call from Standard.  Standard asked Boomi to investigate and rectify a problem that it had encountered in its B2B integration process.  Upon investigation of the problem, it was discovered that the setup of the integration process on Standard's system referred to the existence of an Order Management System ("OMS") application.

40.     Upon information and belief, the OMS is an application that allows Standard to view and manage orders and "posted orders" that have been posted for shipment to customers. The OMS also enables the user to manage and edit storers, sku numbers, and orders.

41.     In response to Standard's request, Boomi accessed Standard's system, and discovered that a user account had been created on this server for Defendant Mozhdehi.

42.     Boomi then looked at the files of the OMS application, and discovered that they were packaged under the name "codeutility."

43.     Defendant Mozhdehi had access to the Custom Load Planner during his tenure as an employee of Boomi and as an independent contractor for Boomi.

44.     The discoveries identified above led Boomi to believe that Defendant Mozhdehi and/or Defendant CodeUtility had disclosed proprietary and confidential information to Standard, and additionally, that Defendant Mozhdehi and/or Defendant CodeUtility had provided B2B integration and development services to Standard without Boomi's knowledge or consent.

45.     In or about October 18th 2004, Boomi compared the Java source code of Standard's OMS application to the original Java source code for the Custom Load Planner developed by Boomi for Saddle Creek.  The source codes were substantially similar, and, indeed, significant portions of the source codes were identical.  In most cases, the Custom Load Planner source code was unchanged with the exception of packaging of the files cosmetically altered to reflect a "codeutility" package name rather than a "boomi" package name.  Additionally, variables within the code that contained the word "boomi" were renamed to "codeutility."

46.     As mentioned above, Defendant CodeUtility is owned and controlled by Defendant Mozhdehi.

47.     Defendants did not seek, and Boomi did not provide, consent for Defendant Mozhdehi or Defendant CodeUtility to perform any services or to develop any products for Standard during Defendant Mozhdehi's tenure as an independent contractor for Boomi, including

misappropriating and/or copying the source code for the Custom Load Planner or providing B2B

integration and development services.

## VII.   Boomi Becomes Aware Of Defendants' Misconduct

48.    By letter dated October 25, 2004, Boomi notified Defendant Mozhdehi that he

had breached the Separation Agreement and Professional Services Agreement and informed him

that, as a result, Boomi was terminating the Professional Services Agreement effective

immediately.

49.    Boomi delivered its letter to Defendant Mozhdehi on October 25, 2004, at

approximately 3:41 p.m.

50.    Upon information and belief, Defendant Mozhdehi accessed Standard's system

after receiving Boomi's letter.

51.    Upon information and belief, portions of the source code of the OMS application

that had existed prior to the delivery of Boomi's October 25, 2004 letter to Defendant Mozhdehi

were no longer present on Standard's system.

52.    Boomi has asked Defendants to return the original source code for the Custom

Load Planner and any and all documents or materials derived therefrom.  Defendants have

refused to do so.

53.    Defendants' knowing and unauthorized copying of the proprietary Custom Load

Planner constitutes willful copyright infringement.

54.    Moreover, Defendant Mozhdehi's knowing and unauthorized performance of

B2B integration and development services for Standard constitutes a willful and tortious breach

of the Separation Agreement, the First Amendment, and the Professional Services Agreement.

55.     Furthermore, Defendants' knowing and unauthorized performance of B2B integration and development services for Standard has interfered with the existing and prospective business relations between Boomi and its current and prospective customers.

56.     Defendants' misconduct, as set forth herein, was intended to, and has harmed Boomi.

57.     Defendants' misconduct, as set forth herein, was and continues to be tortious, malicious, wanton, reckless and/or oppressive.

## VIII.   Boomi and Defendants Agree Upon A Settlement Of This Matter

58.     After Boomi delivered its October 25, 2004 letter to Defendant Mozhdehi, the parties engaged in discussions to resolve this dispute.

59.     On June 24, 2005, the parties reached an agreement with respect to all essential terms of the settlement, including, inter alia, Defendant Mozhdehi's agreement to terminate his position as a shareholder by selling all of his shares of common stock back to Boomi at the cost of zero dollars ($0.00).

60.     On June 27, 2005, Boomi provided Defendants with the final version of the settlement agreement ("Settlement Agreement"), and its Exhibit A, a share purchase agreement. See Exhibit D.

61.     The parties agreed to all of the language contained in the final version of the Settlement Agreement, including Exhibit A.

62.     Since July 29, 2005, Defendants have refused to execute the Settlement Agreement, they have refused to recognize its validity, and they have demonstrated that they have no intention of abiding by it.

63.     Boomi, therefore, asserts the following claims against Defendants, certain of which are asserted in the alternative in the event that the Court concludes that there is no enforceable Settlement Agreement.

## COUNT I

## BREACH OF CONTRACT – SETTLEMENT AGREEMENT

### (Against Both Defendants)

64.     Boomi repeats and realleges the allegations made in Paragraphs 1 through 63 as though fully set forth herein.

65.     The Settlement Agreement is a binding agreement upon Boomi and the Defendants.

66.     Defendants have refused to recognize the validity of the Settlement Agreement and they have demonstrated that they have no intention of abiding by it.

67.     As a result, Defendants have breached the Settlement Agreement.

68.     Boomi is entitled to the damages it has suffered as a result of such breach.

69.     The Court should issue an Order declaring that the Settlement Agreement shall be enforced and awarding Boomi the attorneys' fees, costs and expenses that it has incurred in prosecuting its claims in the instant Complaint.

## COUNT II

## FEDERAL COPYRIGHT INFRINGEMENT

### (Against Both Defendants)

70.     Boomi repeats and realleges the allegations made in Paragraphs 1 through 69 as though fully set forth herein.

12

71.     At all relevant times, Boomi has owned all right, title and interest in and to the copyright in the Custom Load Planner (hereinafter, "Boomi's Copyrighted Work"), and Boomi has complied in all respects with Title 17 of the United States Code, including by filing for copyright registration. See Certificate of Registration, attached hereto as Exhibit E.

72.     Upon information and belief, Defendants have infringed the copyright in Boomi's Copyrighted Work in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501, by unlawfully copying said work and/or by creating a derivative work based upon Boomi's Copyrighted Work without Boomi's consent.  Defendants' infringement is embodied in the OMS application.

73.     Defendants have infringed the copyright in Boomi's Copyrighted Work in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501, by unlawfully distributing copies of and/or derivative works based upon Boomi's Copyrighted Work.  Defendants' infringement is embodied in the OMS application.

74.     Upon information and belief, Defendants engaged in the aforementioned acts of copyright infringement willfully and with full knowledge of Boomi's ownership of the copyright in Boomi's Copyrighted Work.

## COUNT III

### MISAPPROPRIATION OF TRADE SECRETS

#### (Against Both Defendants)

75.     Boomi repeats and realleges the allegations made in Paragraphs 1 through 74 as though fully set forth herein.

76.     The Custom Load Planner was developed by Boomi on or before January of 2004, with significant effort and expense.

77.     In addition to its independent copyright protection, the Custom Load Planner constitutes and/or reflects valuable trade secrets of Boomi and it is of value and important to Boomi in the conduct of its business.

78.     Defendant Mozhdehi acquired knowledge of the Custom Load Planner as a Boomi employee in a position of trust and confidence and under circumstances giving rise to a duty to maintain its secrecy.

79.     Boomi has taken and continues to take reasonable steps to maintain the confidential and secret status of the Custom Load Planner and its source code.

80.     Upon information and belief, the original source code for the Custom Load Planner is not known to others in the business integration software industry or to the public.

81.     Boomi derives independent economic value, actual and potential, from the Custom Load Planner not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use.

82.     Upon information and belief, Defendant Mozhdehi and Defendant CodeUtility disclosed and/or used the source code and/or a derivative of the source code for the Custom Load Planner without the express or implied consent of Boomi.

83.     Upon information and belief, Defendant Mozhdehi and Defendant CodeUtility disclosed and/or used the source code and/or a derivative of the source code for the Custom Load Planner knowing or having reason to know that it was acquired through improper means or was acquired under circumstances giving rise to a duty to maintain its secrecy, and, in so doing, Defendant Mozhdehi and Defendant CodeUtility have misappropriated and stolen Boomi's trade secrets.

84.    Upon information and belief, Defendant Mozhdehi and Defendant CodeUtility have wrongfully used and exploited their ill-gotten knowledge of the source code for the Custom Load Planner – all to Boomi's economic and competitive detriment.

85.    Defendants' conduct was without justification or privilege.

86.    It was and continues to be inequitable and unjust for Defendants to make use of the source code and/or a derivative of the source code for the Custom Load Planner to the prejudice of Boomi.

87.    Upon information and belief, Defendants are continuing their wrongful exploitation and use of Boomi's misappropriated trade secrets.

88.    Defendants' misappropriations of Boomi's trade secrets are causing and will continue to cause Boomi to suffer irreparable harm.

89.    Defendants' conduct was intentional, willful, outrageous and malicious, and justify the imposition of exemplary and punitive damages and attorneys' fees.

## COUNT IV

## BREACH OF CONTRACT – NON-DISCLOSURE OBLIGATIONS

### (Against Defendant Mozhdehi)

90.    Boomi repeats and realleges the allegations made in Paragraphs 1 through 89 as though fully set forth herein.

91.    Pursuant to the Separation Agreement, as reaffirmed in the First Amendment, Defendant Mozhdehi agreed to certain non-disclosure obligations, including, among other things, to "use all reasonable efforts to protect the Company's Confidential Information," to "keep secret all such Confidential Information," and to "not disclose such Confidential Information to anyone outside of the Company," for a period of three (3) years after the Termination Date.

92.    The source code for the Custom Load Planner constitutes Confidential Information within the meaning of the Separation Agreement.

93.    In the Professional Services Agreement, Defendant Mozhdehi agreed to continue to be bound by his non-disclosure obligations for a period of three (3) years after the termination of the Professional Services Agreement.

94.    Defendant Mozhdehi violated his non-disclosure obligations when he used and disclosed such Confidential Information in developing the OMS application and performing B2B integration services for Standard.

95.    Defendant Mozhdehi's violation of his non-disclosure obligations constitutes a material breach of the Separation Agreement, the First Amendment, and the Professional Services Agreement.

96.    As a direct and proximate result of Defendant Mozhdehi's material breach, Boomi has suffered and will continue to suffer irreparable harm.

## COUNT V

### BREACH OF CONTRACT –
### OBLIGATION TO RETURN COMPANY PROPERTY

### (Against Defendant Mozhdehi)

97.    Boomi repeats and realleges the allegations made in Paragraphs 1 through 96 as though fully set forth herein.

98.    Pursuant to the Separation Agreement, as reaffirmed in the First Amendment, Defendant Mozhdehi agreed to "deliver promptly to the Company or immediately after the Termination Date, or at any other time the Company may so request, all documents containing Confidential Information and all other property of the Company, which Mr. Mozhdehi obtained

while employed by, or otherwise serving or acting on behalf of, the Company and which he may then possess or have under his control."

99.     The Custom Load Planner source code constitutes Company Property and Confidential Information within the meaning of the Separation Agreement.

100.     Defendant Mozhdehi violated his obligation to return company property when he failed to return to Boomi the source code for the Custom Load Planner and any and all documents or materials derived therefrom.

101.     Defendant Mozhdehi's violation of his obligation to return Company Property constitutes a material breach of the Separation Agreement and the First Amendment.

102.     As a direct and proximate result of Defendant Mozhdehi's material breach, Boomi has suffered and will continue to suffer irreparable harm.

<u>**COUNT VI**</u>

<u>**BREACH OF CONTRACT – NON-COMPETITION OBLIGATIONS**</u>

<u>**(Against Defendant Mozhdehi)**</u>

103.     Boomi repeats and realleges the allegations made in Paragraphs 1 through 102 as though fully set forth herein.

104.     Pursuant to the Separation Agreement, as reaffirmed in the First Amendment, Defendant Mozhdehi agreed to certain non-competition obligations, including, among other things, a prohibition against directly or indirectly associating with any business which "directly or indirectly competes . . . with the business of the Company," for a period of one (1) year after the Termination Date.

105.     In the Professional Services Agreement, Defendant Mozhdehi agreed to continue to be bound by his non-competition obligations for a period of one (1) year after the termination of the Professional Services Agreement.

106.     CodeUtility, a business that is owned and controlled by Defendant Mozhdehi, directly or indirectly competes with Boomi's business because it markets and sells products and services that include "business to business integration software and/or services and enterprise application software and/or services," and also because it has marketed and sold products which are derived from the original source code for the Custom Load Planner developed by Boomi during Defendant Mozhdehi's employment with Boomi, including but not limited to the OMS application, and provided services related to same.

107.     As a result, Defendant Mozhdehi violated his non-competition obligations and materially breached the Separation Agreement, the First Amendment, and the Professional Services Agreement.

108.     As a direct and proximate result of Defendant Mozhdehi's material breach, Boomi has suffered and will continue to suffer irreparable harm.

## COUNT VII

## BREACH OF CONTRACT – NON-SOLICITATION OBLIGATIONS

### (Against Defendant Mozhdehi)

109.     Boomi repeats and realleges the allegations made in Paragraphs 1 through 108 as though fully set forth herein.

110.     Pursuant to the Separation Agreement, as reaffirmed in the First Amendment, Defendant Mozhdehi agreed to certain non-solicitation obligations, including, among other things, a prohibition against directly or indirectly seeking "Prohibited Business . . . on behalf of

18

any enterprise or business other than the Company," referring "Prohibited Business" from a Boomi customer to a company other than Boomi, or receiving "commissions based on sales or otherwise relating to Prohibited Business from any customer, or any enterprise or business other than the Company."

111.    CodeUtility, a business that is owned and controlled by Defendant Mozhdehi, is engaged in Prohibited Business because it marketed and sold products and services that include "business to business integration software and/or services and enterprise application software and/or services" to Boomi's customer, Standard, and also because it developed, produced, marketed and/or sold products which are derived from the original source code for the Custom Load Planner developed by Boomi during Defendant Mozhdehi's employment with Boomi, including but not limited to the OMS application, and provided services related to same.

112.    In the Professional Services Agreement, Defendant Mozhdehi agreed to continue to be bound by his non-competition obligations for a period of one (1) year after the termination of the Professional Services Agreement.

113.    As a result, Defendant Mozhdehi violated his non-solicitation obligations and materially breached the Separation Agreement, the First Amendment, and the Professional Services Agreement.

114.    As a direct and proximate result of Defendant Mozhdehi's material breach, Boomi has suffered and will continue to suffer irreparable harm.

## COUNT VIII

## TORTIOUS INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONS

### (Against Both Defendants)

115.   Boomi repeats and realleges the allegations made in Paragraphs 1 through 114 as though fully set forth herein.

116.   Boomi had contractual and business relationships with SSA Global and Standard.

117.   Through their misconduct, as set forth herein, Defendants have intended to harm the contractual and business relationships between Boomi and its existing and prospective customers, including SSA Global and Standard.

118.   Defendants have interfered with these contractual and business relationships.

119.   No privilege or justification excuses this interference.

120.   Boomi has been damaged by the Defendants' interference with Boomi's contractual and business relationships.

121.   As a direct and proximate result of Defendants' tortious interference with Boomi's existing and prospective contractual relationships, Boomi has suffered and continues to suffer damages.

122.   Defendants' conduct was intentional, willful, outrageous and malicious, and justifies the imposition of punitive damages.

### COUNT IX

### CONVERSION

### (Against Both Defendants)

123.   Boomi repeats and realleges the allegations made in Paragraphs 1 through 122 as though fully set forth herein.

124.   Defendants have refused to acknowledge Boomi's ownership of the original source code for the Custom Load Planner, and they have converted that source code for their own gain, without Boomi's consent and without lawful justification.

125.   As a direct and proximate result of Defendants' unlawful conversion of the source code for the Custom Load Planner, Boomi has suffered and continues to suffer damages.

126.   Defendants' conduct was intentional, willful, outrageous and malicious, and justifies the imposition of punitive damages.

**COUNT X**

**UNJUST ENRICHMENT**

**(Against Both Defendants)**

127.   Boomi repeats and realleges the allegations made in Paragraphs 1 through 126 as though fully set forth herein.

128.   Defendants have been unjustly enriched by their wrongful conduct, as set forth in this Complaint.

129.   Boomi is entitled to compensation for the wrongful conduct by Defendants.

WHEREFORE, Boomi prays for judgment against Defendants as follows:

1.   That the Court issue an Order to declaring that the Settlement Agreement shall be enforced and awarding Boomi the damages it has suffered as a result of Defendants' breach of the Settlement Agreement.

2.   That Defendants be ordered to immediately return all Company Property and Confidential Information to Boomi, including the source code for the Custom Load Planner and any and all documents and materials derived therefrom;

3.   That Defendants be preliminarily and permanently enjoined from marketing or

21

selling any products derived from the source code for the Custom Load Planner;

4.      That Defendant Mozhdehi be preliminarily and permanently enjoined from engaging in conduct that violates his non-disclosure obligations for a period of three (3) years following the entry of the Court's Order directing same;

5.      That Defendant Mozhdehi be preliminarily and permanently enjoined from engaging in conduct that violates his non-competition obligations for a period of one (1) year following the entry of the Court's Order directing same;

6.      That Defendant Mozhdehi be preliminarily and permanently enjoined from engaging in conduct that violates his non-solicitation obligations for a period of one (1) year following the entry of the Court's order directing same;

7.      That Boomi recover its damages sustained as a result of Defendants' wrongful conduct and that the Court exercise its discretion and enter a judgment for such additional sums as the Court shall find just, according to the egregious nature of the acts of Defendants, including but not limited to exemplary and punitive damages;

8.      That Boomi be permitted, pursuant to a Shareholders' Agreement between Boomi and Defendant Mozhdehi dated August 29, 2001, to repurchase securities held by Defendant Mozhdehi at Book Value of $0.00;

9.      That there be a decree ordering an accounting by Defendants to establish the profits that they have earned through their wrongful conduct; and

10.    That Boomi recover from Defendants all costs incurred in this action, including

the reasonable attorneys' fees incurred in connection with this litigation, together with such other

and further relief as this Court may deem just and proper.

Dated:  November 4, 2005

Paul D. Weller (Pa. ID No. 61175)
Tamsin J. Newman (Pa. ID No. 81001)
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5530/5201

Attorneys for Plaintiff

**Exhibit A**

## SEPARATION AGREEMENT AND GENERAL RELEASE

**THIS AGREEMENT**, entered into this 20th day of February, 2004, is made by and between **Brian Mozhdehi** ("Mr. Mozhdehi") and **Boomi, Inc.** ("Boomi" or the "Company"), a Pennsylvania corporation with its principal place of business at 625 W. Ridge Pike, Building E, Suite 201, Conshohocken, PA 19428.

**WHEREAS**, in or about April of 2002, Mr. Mozhdehi and the Company entered into an Employment Agreement providing for Mr. Mozhdehi to serve as Chief Executive Officer of the Company pursuant to certain terms and conditions ("Employment Agreement");

**WHEREAS**, in or about August of 2001, Mr. Mozhdehi entered into an Employee Non-Disclosure, Assignment of Developments, Non-Solicitation and Non-Competition Agreement ("August 2001 Agreement");

**WHEREAS**, on August 29, 2001, Mr. Mozhdehi and the Company entered into a Shareholders' Agreement ("Shareholders' Agreement");

**WHEREAS**, Mr. Mozhdehi and the Company have decided that it would be in their mutual best interests to sever Mr. Mozhdehi's employment relationship with the Company and for Mr. Mozhdehi to provide professional services to the Company as an independent contractor, the terms and conditions of such professional services relationship are provided in a separate agreement dated February 20th, 2004 ("Professional Services Agreement");

**WHEREAS**, Mr. Mozhdehi and the Company intend for certain provisions in the Employment Agreement and the Shareholders' Agreement to continue with full force and effect, as expressly provided herein.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants herein contained, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Mr. Mozhdehi and the Company agree as follows:

1. **Separation from Employment.** Mr. Mozhdehi and the Company agree that as of the date that Mr. Mozhdehi executes this Agreement, Mr. Mozhdehi relinquishes his rights and duties as Chief Executive Officer and Director of the Company and any other officer or director positions with the Company. Mr. Mozhdehi and the Company further agree that effective February 29, 2004, Mr. Mozhdehi's employment relationship with the Company will be permanently and irrevocably severed ("Termination Date"), and that the Company has no obligation, contractual or otherwise, to employ him in the future. Mr. Mozhdehi acknowledges that he is not entitled to any compensation or benefits after the Termination Date, except for salary that is accrued but not yet paid based on his employment prior to the Termination Date, and except as expressly provided in this Agreement.

2. **Consideration.**

   a.   Compensation; Deferred Compensation. On or before February 29, 2004, the Company will pay Mr. Mozhdehi all amounts owed as deferred compensation ($8,333.33), less all advances previously paid to him ($4,970.48), on or before February

29, 2004. The Company will also pay Mr. Mozhdehi his regular salary for the second half of February 2004 payroll.

     b.    <u>Loan Repayment</u>. On or before March 31, 2004, the Company will pay Mr. Mozhdehi $16,959.63, representing full and complete repayment of the loan that Mr. Mozhdehi extended to the Company in December of 2003.

     c.    <u>Release of Loan Guarantee</u>. On or before March 15, 2004, the Company will release Mr. Mozhdehi from his obligations as co-guarantor of a $50,000.00 floating line of credit that was obtained on behalf of the Company in December of 2003.

     d.    <u>Severance</u>. Provided that Mr. Mozhdehi fulfills the requirements of Paragraph 3.b below, the Company will pay Mr. Mozhdehi severance amounting to a total of $100,000.00 (One Hundred Thousand Dollars And Zero Cents) (the "Severance Amount") in the manner provided herein.

     i.    In the event of a Change In Control (as defined in the Employment Agreement) effective prior to August 15, 2004, the Company shall pay the Severance Amount to Mr. Mozhdehi within ten (10) business days after the Change In Control becomes effective.

     ii.    If a Change In Control does not become effective prior to August 15, 2004, the Company will pay Mr. Mozhdehi the Severance Amount in six (6) equal monthly installments beginning September 1, 2004.

3.   <u>Release</u>.

     a.    In consideration for the Company entering into the Professional Services Agreement and the other consideration described in Paragraphs 2.a, 2.b, and 2.c above, Mr. Mozhdehi hereby **REMISES, RELEASES, AND FOREVER DISCHARGES** the Company, its present and past parents, subsidiaries and affiliates, successors and assigns, and their respective present or past officers, directors, shareholders, employees, agents and insurers (collectively, the "Company Released Parties") of and from any and all manner of actions and causes of action, suits, debts, claims and demands whatsoever in law or in equity, which he ever had, now have, or hereafter may have, or which his heirs, executors or administrators hereafter may have, by reason of any matter, cause, or thing whatsoever from the beginning of his employment with the Company until the execution date of this Agreement, and particularly, but without limitation of the foregoing general terms, any claims arising under the Employment Agreement, the August 2001 Agreement, and/or the Shareholders' Agreement, and any claims concerning or relating in any way to his employment relationship or the termination of his employment relationship with the Company, including any claims arising under Title VII of the Civil Rights Act of 1964 (as amended by the Civil Rights Act of 1991), the Americans With Disabilities Act, the Rehabilitation Act of 1973, the Equal Pay Act, the Fair Labor Standards Act, the Older Workers Benefits Protection Act, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act, the Pennsylvania Human Rights Act, the Pennsylvania Wage Payment and Collection Act, or any other federal, state or local law, ordinance, regulation, rule or executive order, and any common law claims now or hereafter recognized, including all claims, matters and issues which he could have asserted against the

Company Released Parties in any legal, administrative or other proceeding, including any claim for attorneys' fees or costs.

      b.    In consideration for the Severance Amount described in Paragraph 2.d above, Mr. Mozhdehi agrees to execute the General Release attached hereto as Exhibit A on the Termination Date. Mr. Mozhdehi's entitlement to the Severance Amount is expressly conditioned upon his execution of such General Release.

      4.  **Transitional Assistance.**  In consideration for the Company entering into the Professional Services Agreement and the other consideration described in Paragraphs 2.a., 2.b, and 2.c above, Mr. Mozhdehi will provide transitional assistance to the Company from the date that he executes this Agreement through the Termination Date.  Specifically, Mr. Mozhdehi agrees to continue to provide billable services to the Company's clients and to assist the Company with transitional issues, including without limitation: facilitating the Company's understanding of its services commitments to customers; review of receivables; transition of the sales pipeline; transition of custom development work; assisting in external communications; and any other transitional assistance reasonably requested by the Company.

      5.  **Repurchase of Securities.**  Provided that Mr. Mozhdehi satisfactorily fulfills his obligations pursuant to Paragraph 4 above, the Company waives its right to repurchase the Securities held by Mr. Mozhdehi pursuant to Section 2.3 of the Shareholders' Agreement. If the Company determines that Mr. Mozhdehi has not fulfilled such obligations, it shall provide written notice to that effect to Mr. Mozhdehi, within two (2) business days of the Company's determination, such notice to be received by Mr. Mozhdehi no later than March 15, 2004.  The Company's notice shall detail the portions of  Mr. Mozhdehi's obligation which the Company has determined he has not satisfactorily fulfilled.  Mr. Mozhdehi shall have five (5) business days in which to cure.  The parties shall settle any controversy arising out of this section by arbitration in Philadelphia, Pennsylvania in accordance with the rules of the American Arbitration Association. The Company shall not exercise its right to repurchase Mr. Mozhdehi's securities unless and until any dispute between the parties regarding  this section is fully adjudicated.  In the event that the Company retains its right to repurchase Mr. Mozhdehi's Securities and exercises that right, the purchase price to be paid for each share of Securities purchased shall be the lower of Book Value or Current Market Price as of the relevant Valuation Date.  In the event that the Company waives such right and Mr. Mozhdehi agrees to sell his Securities, the purchase price to be paid for each share of Securities purchased by the Company shall be the Current Market Price as of the Valuation Date. (The definitions of all defined terms used in this Paragraph are set forth the Shareholders' Agreement.)

      6.  **Participation in Litigation.**  Mr. Mozhdehi agrees to provide such information and assistance as shall be reasonably necessary in connection with the defense or conduct of such lawsuits and proceedings that may be brought by or against the Company or its affiliates that are related to and/or arise out of events during the term of his employment, including without limitation voluntarily appearing at depositions, hearings, and other proceedings in connection therewith in order to give truthful testimony.  In the event that Mr. Mozhdehi is subpoenaed or otherwise contacted in any way in connection with any litigation or investigation involving the Company or any the Company related entity, he will use his reasonable best efforts to immediately notify the Company and give the Company an opportunity to respond to such notice before taking any action or making any decision in connection with such subpoena or other contact.

The Company will reimburse Mr. Mozhdehi for reasonable out-of-pocket expenses, including attorneys' fees, incurred as a result of such cooperation, to the extent Mr. Mozhdehi would otherwise be entitled to indemnification therefor.

7. **Protection of Confidential Information; Non-Competition; Non-Solicitation of Employees**

a.    Mr. Mozhdehi acknowledges that his employment by the Company has brought him into close contact with many confidential affairs of the Company, including, without limitation, information about costs, profits, markets, sales, products, intellectual property, key personnel, pricing policies, operational methods, technical processes, strategic plans and other business affairs and methods and other information not readily available to the public (collectively, "Confidential Information"). Mr. Mozhdehi further acknowledges that the services that he rendered and continues to render to the Company are of a special, unique, unusual, extraordinary and intellectual character. In recognition of the foregoing, Mr. Mozhdehi covenants and agrees:

(1)    **Non-Disclosure of Confidential Information.** For the remainder of his employment with the Company, Mr. Mozhdehi shall use all reasonable efforts to protect the Company's Confidential Information and shall keep secret all such Confidential Information, including without limitation, the terms and provisions of this Agreement, and shall not disclose such Confidential Information to anyone outside of the Company except as required in the performance of his duties under this Agreement, either during or for a period of 3 years after the Termination Date, except with the Company's written consent, provided that:

(a)    Mr. Mozhdehi shall have no such obligation to the extent such Confidential Information is or becomes publicly known other than as a result of Mr. Mozhdehi's breach of his obligations hereunder;

(b)    Mr. Mozhdehi may, after giving prompt written notice to the Company to the extent practicable under the circumstances, disclose such Confidential Information to the extent required by applicable laws or governmental regulations or judicial or regulatory proceedings; and

(c)    Mr. Mozhdehi may disclose the terms and provisions of this Agreement to his spouse and legal, tax and financial advisors.

(2)    **Return of Company Property and Confidential Information.** Mr. Mozhdehi shall deliver promptly to the Company on or immediately after the Termination Date, or at any other time the Company may so request, at the Company's expense, all documents containing Confidential Information and all other property of the Company, which Mr. Mozhdehi obtained while employed by, or otherwise serving or acting on behalf of, the Company and which he may then possess or have under his control.

(3)    **Non-Solicitation/Non-Hiring of Employees.** Mr. Mozhdehi agrees that, during the term of his employment and for a period of one (1) year thereafter, he shall not, directly or indirectly, on his own or on behalf of any other person or entity, solicit or induce, or attempt to solicit or induce, any person who is an employee of the Company to terminate his or her employment with the Company. Mr. Mozhdehi further agrees that, during the term of this

- 4 -

Agreement and for a period of one (1) year thereafter, he shall not, directly or indirectly, on his own behalf or on behalf of any other person or entity, hire or cause to be hired any person who is an employee of the Company in the event that such person(s) approach(es) Mr. Mozhdehi or a future employer of Mr. Mozhdehi without direct or indirect solicitation by the employee.

      b.    **Non-Compete**.  Mr. Mozhdehi expressly covenants and agrees that he will not directly or indirectly, without the prior written consent of a majority of the Board, for the remainder of his employment with the Company and for a period of one year following the Termination Date, own, manage, operate, join, control, receive compensation or benefits from, or participate in the ownership, management, operation, or control of, or be employed or be otherwise connected in any manner with, any business in North America or Europe, which directly or indirectly competes (as defined in the following sentence) with the business of the Company or any of its subsidiaries or affiliates, as conducted or planned by the Company or any subsidiary or affiliate during my employment; provided, however, that the foregoing shall not prohibit Mr. Mozhdehi from acquiring, solely as an investment and through market purchases, securities of any entity which are registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934 and which are publicly traded, so long as Mr. Mozhdehi is not part of any control group of such entity and such securities, if converted, do not constitute more than five percent (5%) of the outstanding voting power of that entity.  For purposes of this paragraph, "competes" means the development, production, marketing or sale of any business to business integration software and/or services and enterprise application integration software and/or services or other product or service discovered, developed, produced, marketed or sold by the Company (or to Mr. Mozhdehi's knowledge was under development by the Company or any of its subsidiaries or affiliates) during Mr. Mozhdehi's employment for any person other than the Company or its subsidiaries or affiliates.

      c.    **Solicitation of Customers.**  For the remainder of Mr. Mozhdehi's employment with the Company and for a period of one year following the Termination Date, Mr. Mozhdehi, directly or indirectly, will not seek Prohibited Business from any Customer (as defined below) on behalf of any enterprise or business other than the Company, refer Prohibited Business from any Customer to any enterprise or business other than the Company or receive commissions based on sales or otherwise relating to the Prohibited Business from any Customer, or any enterprise or business other than the Company.  For purposes of this paragraph, the term "Customer" means any person, firm, corporation, partnership, association or other entity to which the Company or any of its affiliates sold or provided goods or services during the 24-month period prior to the time at which any determination is required to be made as to whether any such person, firm, corporation, partnership, association or other entity is a Customer.  For the purposes of this Paragraph, "Prohibited Business" means the development, production, marketing or sale of any business to business integration software and/or services and enterprise application integration software and/or services or other product or service discovered, developed, produced, marketed or sold by the Company (or to Mr. Mozhdehi's knowledge was under development by the Company or any of its subsidiaries or affiliates) during Mr. Mozhdehi's employment for any person other than the Company or its subsidiaries or affiliates.

      d.    **Assignment of Inventions.**

      (1)    Mr. Mozhdehi will use his best efforts to make prompt and full disclosure to the Company, and will hold in trust for the sole benefit of the Company, and assign exclu-

sively to the Company all of his right, title, and interest in and to any and all inventions, discoveries, designs, developments, improvements, copyrightable material, and trade secrets that Mr. Mozhdehi solely or jointly may conceive, develop, author, reduce to practice or otherwise produce during his employment with the Company (collectively herein "Inventions").  Mr. Mozhdehi waives and quitclaims to the Company any and all claims of any nature whatsoever that he now has or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions.

        (2)    Notwithstanding the foregoing paragraph, the Executive's obligation to assign shall not apply to any Invention about which he can prove all of the following:

        i.    the Invention was developed by Mr. Mozhdehi without materially interfering with his obligations under the Employment Agreement;

        ii.    no Confidential Information of the Company was used in the development of the Invention;

        iii.    the Invention does not relate (y) directly to the business of the Company; or (z) to the actual or demonstrably anticipated business, research or development of the Company; and

        iv.    the Invention does not result from any work performed by Mr. Mozhdehi during his employment with the Company.

        c.    **Specific Remedy.**  Mr. Mozhdehi and the Company agree that the restrictions outlined in this Paragraph 7 are reasonable and necessary protections of the immediate interests of the Company and that the Company would not have entered into this Agreement without receiving additional consideration offered by Mr. Mozhdehi in binding himself to these restrictions.  In addition to such other rights and remedies as the Company may have at equity or in law with respect to any breach of this Agreement, if Mr. Mozhdehi commits a material breach of any of the provisions of this Paragraph 7, the Company shall have the right and remedy to have such provisions specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and that money damages will not provide an adequate remedy to the Company.  In the event that, notwithstanding the foregoing, a restriction or any portion thereof, contained in this Paragraph 7 is deemed to be unreasonable by a court of competent jurisdiction or other appropriate reviewing body, Mr. Mozhdehi and the Company agree that it will not violate the intent of the parties if such court (or other reviewing body) modifies the restriction(s), or portion thereof, in order to make it reasonable and shall be enforceable accordingly.

        8.    **Paragraph Headings.**  The paragraph headings in this Agreement and Release are included for convenience only and should not be considered in interpreting this Agreement and Release.

        9.    **General Rule of Construction.**  This Agreement and Release will be construed as a whole according to its fair terms.  It will not be construed strictly for or against either party.

10. **Governing Law.**  Unless federal law controls, this Agreement will be governed by Pennsylvania law, without regard to conflict of laws principles.

11. **Entire Agreement.**  This Agreement is the entire agreement between the Company and Mr. Mozhdehi regarding his employment relationship and the termination of that relationship and supersedes all prior agreements between the parties, oral and written, except that all provisions of the Shareholder Agreement (except for Section 2.3, as modified pursuant to Paragraph 5 above) shall expressly survive and continue with full force and effect.

12. **Acknowledgements.**  Mr. Mozhdehi hereby certifies and acknowledges that:

    a.    He has read this Agreement and Release and he understands its terms and effects, including the fact that he has agreed to **RELEASE AND FOR-EVER DISCHARGE** the Company Released Parties from any and all claims arising out of his employment relationship with the Company, the terms and conditions of that employment relationship, and the termination of that employment relationship.

    b.    Mr. Mozhdehi was given a reasonable period of time to consider this Agreement.

    c.    Mr. Mozhdehi has signed this Agreement and Release voluntarily and knowingly in exchange for the consideration provided to him.  Mr. Mozhdehi would not otherwise be entitled to such consideration and he acknowledges that the consideration provided to him as a result of signing this Agreement and Release is adequate and satisfactory.

    d.    Mr. Mozhdehi has been advised by this writing that the signing of this Agreement and Release does not waive rights or claims that may arise after the date the Agreement and Release is executed.

    e.    This writing advises Mr. Mozhdehi to consult with an attorney concerning this Agreement and Release, prior to signing this Agreement and Release.

    f.    Neither the Company, nor any of its agents, representatives, employees, or attorneys, have made any representations to Mr. Mozhdehi concerning the terms or effects of this Agreement and Release other than those contained herein.

**IN WITNESS WHEREOF**, and intending to be legally bound, Mr. Mozhdehi hereby executes the foregoing Separation Agreement and General Release.

Signature: Brian Mozhdehi

Date: 2/20/2004

Accepted:

BOOMI, INC.

By:

Name: MICHAEL A. WEST

Title: President

- 8 -

**Exhibit B**

**Boomi, Inc.**
**Professional Services Agreement**

**THIS AGREEMENT**, entered into this 20th day of February, 2004 by and between **Boomi, Inc.** maintaining its offices at 625 W. Ridge Pike, Building E, Suite 201, Conshohocken, PA 19428 ("BOOMI" or the "Company") and **Brian Mozhdehi** residing at 746 Bainbridge Street, Philadelphia, PA 19147 ("Independent Contractor" or "Mr. Mozhdehi").

**WHEREAS**, Independent Contractor was formerly employed by the Company pursuant to an Employment Agreement executed in or about April of 2002 ("Employment Agreement");

**WHEREAS**, and on February 20th, 2004, Independent Contractor and the Company entered into a Separation Agreement and General Release that severed their employment relationship ("Separation Agreement");

**WHEREAS**, Independent Contractor agrees to provide BOOMI and/or BOOMI clients certain programming, consulting and/or system services as more particularly described herein below; and

**WHEREAS**, BOOMI desires to compensate Independent Contractor for providing such services, all as more particularly set forth herein below.

**NOW, THEREFORE**, in consideration of the premises as set forth above which are expressly made part of this Agreement and the mutual promises and covenants contained herein, the parties agree as follows:

## 1. Services

Independent Contractor agrees to provide BOOMI and/or anyone designated in writing by BOOMI upon the terms and conditions hereinafter set forth, computer programming, computer consulting and/or computer software and support services and any other services requested in writing by BOOMI (collectively, the "Services").

## 2. Term of Agreement

a. This Agreement shall commence on **March 1, 2004** and shall terminate on **May 1, 2004** ("Termination Date"). The commencement date shall become valid upon approval of Independent Contractor by Client of BOOMI and upon approval of working permits for Independent Contractor.

b. The term of this Agreement shall be automatically extended upon the same terms and conditions unless proper termination or cancellation was received. Except as expressly provided herein, either party may terminate this Agreement during the extended term by giving the other party at least fifteen (15) days prior written notice. However, Independent Contractor shall not be permitted to terminate if he or she is engaged on a project and has not

1

completed its obligations thereunder, except that Independent Contractor shall be permitted to terminate if the project remains incomplete for a period of ninety (90) days.

c. This Agreement shall terminate upon Independent Contractor's death or disability. For the purpose of this agreement, disability shall mean the inability to perform services because of sickness and/or injury for a consecutive twelve (12) week period. The disability needs to be documented in writing by a physician.

### 3. Performance of Services

a. Independent Contractor represents and warrants that the Services shall be performed in a good, professional and workman-like manner and be satisfactory to the client. If the client rejects the Services required hereunder, Independent Contractor shall promptly correct Services such during the term and/or extended term for acceptance by the client. Independent Contractor shall not charge BOOMI nor shall BOOMI be required to pay for those services. BOOMI has no right to control the method or manner of the job to be performed, other than the services must be performed at the location of the client's worksite, during the client's usual and customary business hours if required.

b. It is understood and agreed that in addition to performing Services directly for BOOMI Independent Contractor shall be performing Services for clients of BOOMI on a project by project basis, as BOOMI may designate from time to time, in writing. All written assignments designated to Independent Contractor shall be documented on "Scope of Work" forms attached hereto and made a part hereof as Exhibit "A". The consultants referenced in the "Scope of Work" shall not be substituted by Independent Contractor unless prior written consent of BOOMI, which may be reasonably withheld by BOOMI, is first obtained.

c. The Independent Contractor shall abide by all reasonable instructions provided by BOOMI or any client of BOOMI regarding the Services.

d. The Independent Contractor shall not cause BOOMI to be in breach of its agreement with any of its clients.

e. The Independent Contractor acknowledges and agrees that the performance of the Services requires the Independent Contractor to maintain a high degree of interpersonal, technical, and professional skills. In the event that the client is not satisfied with Independent Contractor's performance, then BOOMI may terminate this Agreement, upon ten (10) days advance written notice, without any future liability to Independent Contractor .

f. Independent Contractor hereby acknowledges and agrees that it shall provide the normal and customary equipment for performance of the Services which may include, but not limited to, laptop computers, files and similar items. The Independent Contractor may be required to provide a Pentium III or better Personal Computer with 256 Meg RAM and Windows 2000 or XP. There must be at least 3.0 GB available storage on the consultant's hard drive for software and files to be provided by BOOMI and/or client. In addition, the Independent Contractor must have versions of Microsoft Word and Excel.

2

g. Independent Contractor has the right to hire and terminate an assistant. However, Independent Contractor must have previous written approval from BOOMI prior to contract period.

### 4. Payment to Independent Contractor

a. In consideration of the Services to be rendered by Independent Contractor, BOOMI shall pay to Independent Contractor the amounts set forth in the "Scope of Work" attached as Exhibit A.

b. Travel expenses will be paid by BOOMI only if Independent Contractor receives a request by BOOMI to travel.

c. Independent Contractor shall invoice BOOMI on a monthly basis on the last working day of each calendar month, attaching all activity summaries and any other supporting documentation requested by BOOMI for Services performed during the immediately preceding month. BOOMI shall pay such invoices as set forth in the "Scope of Work" attached in Exhibit "A".

d. BOOMI agrees that if the Independent Contractor's invoice payment for client approved billable hours and expenses is considered late the Independent Contractor may terminate this agreement by giving BOOMI two (2) weeks written notice. For this purpose a payment will be considered late if it is received by Independent Contractor later than the date calculated by the BOOMI receipt of invoice date plus the payment terms set forth in the "Scope of Work" Exhibit "A" plus a grace period of five (5) additional business days. Independent Contractor agrees that failure to invoice BOOMI as outlined in paragraph 4c may delay payment up to thirty (30) days. Independent Contractor agrees that should BOOMI exercise the Right of Set-Off outlined in paragraph 17 of this agreement that this may delay payment. Independent Contractor agrees that in both before-mentioned cases these delays in payment will not be considered late as defined in this paragraph. Additionally, Independent Contractor agrees that if a BOOMI client is paying expenses directly to Independent Contractor any late payment by the BOOMI client for expenses will not constitute a late payment as defined in this paragraph.

### 5. Relationship of the Parties

a. It is understood and agreed that Independent Contractor will provide the services to BOOMI as an Independent Contractor, with all of its attendant rights and liabilities and shall not be considered an agent or employee of BOOMI. No relationship of employer/employee shall result in the execution of this Agreement or from the performance of any Services hereunder. Independent Contractor acknowledges and agrees that nothing herein shall entitle or render Independent Contractor eligible to participate in any benefits or privileges provided by BOOMI for its employees. As an Independent Contractor, Independent Contractor acknowledges that he is solely responsible for providing his own insurance coverage (e.g. medical, life, disability, retirement, unemployment compensation, workers compensation, errors and omission etc.) for its employees, and that such coverage shall be maintained by

3

Independent Contractor in the statutory limits which are presently in effect or which may be in effect in the Commonwealth of Pennsylvania.

b. Independent Contractor acknowledges and agrees that it is an independent business and is responsible to obtain all required business licenses and/or registrations, and for compliance with all applicable federal, state, and local tax requirements as well as the Self Employment Tax for U.S. residents in connection with the Services rendered and that these are not the responsibility of BOOMI. Furthermore, Independent Contractor acknowledges that overhead associated with the operation of its independent business shall be his sole responsibility.

c. Independent Contractor agrees to provide BOOMI, within ten (10) days of the commencement date defined in section two (2) above, a W-9 with a valid Tax Identification Number.

**6. <u>Non-Disclosure Of Confidential Information.</u>** Independent Contractor hereby reaffirms his obligations set forth in Paragraph 7.a.(1) of the Separation Agreement regarding the protection of Confidential Information (as defined in that Agreement). Independent Contractor further agrees that his obligations under this provision shall extend for a period of three (3) years following the termination of this Professional Services Agreement.

**7. <u>Non-Competition and Non-Solicitation.</u>** Independent Contractor hereby reaffirms his obligations set forth in Paragraphs 7.a.(3), 7.b., and 7.c. of the Separation Agreement regarding non-solicitation/non-hiring of Company employees, non-competition, and non-solicitation of customers. Independent Contractor further agrees that his obligations under these provisions shall extend for a period of one (1) year following the termination of this Professional Services Agreement.

**8. <u>Insurance</u>**

a. While performing Services for BOOMI or its customers, Independent Contractor shall carry, at his own cost and expense, and for his own benefit, comprehensive general liability insurance, workers compensation insurance, medical insurance, general liability, and errors and omissions insurance. In addition, Independent Contractor shall maintain automobile liability insurance, owners, non-owners and rental coverage with a bodily injury, death and property damage.

b. Independent Contractor must provide BOOMI certificates of insurance for both General Liability insurance and Errors & Omissions. General Liability insurance in amounts no less that two (2) million dollars aggregate per policy period and one (1) million maximum per occurrence. Errors & Omissions insurance in amounts no less that two (2) million dollars aggregate per policy period and one (1) million maximum per occurrence. BOOMI reserves the right to withhold payment on Independent Contractor's invoices until the submission requirement of insurance certificates is satisfied.

c. This section shall not limit the liability of Independent Contractor for any act or failure to act exposing it to liability.

4

## 9. Indemnification

Independent Contractor shall indemnify, hold harmless and defend BOOMI from and against any action, suit, claim, demand, liability, damage, loss, cost and/or expense incurred as a result of bodily injury or death, and/or property damage and/or losses or liabilities in any way arising out of or in connection with performance of the Service under this Agreement, unless same was caused by willful misconduct or negligence of BOOMI.

## 10. Notices

All required notices shall be in writing and mailed, by Certified Mail, postage prepaid, or by a recognized overnight mail service, to the following address:

If to BOOMI:  
    **Boomi, Inc.**  
    **625 W. Ridge Pike**  
    **Building E, Suite 201**  
    **Conshohocken,  PA  19428**

If to Independent Contractor :

    **Brian Mozhdehi**  
    **746 Bainbridge Street**  
    **Philadelphia,  PA  19147**

## 11. Assignment

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors.  Notwithstanding the foregoing, the obligations of Independent Contractor under this Agreement may not be assigned in whole or in part without the prior written consent of BOOMI, which consent may be withheld for any reason or for no reason whatsoever.  BOOMI may, upon written notice to Independent Contractor, assign its rights under this Agreement.

## 12. Governing Law

This Agreement and all questions relating to its validity, interpretation, performance and enforcement (including, without limitation, provisions concerning limitations of actions), shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, notwithstanding any conflict of laws, doctrines of such states or other jurisdiction to the contrary, and without the aid of any canon, custom or rule or law requiring construction against the draftsman.

## 13. Amendments

This agreement may not be modified, changed, amended or altered except in writing, signed by the parties hereto.

## 14. Compliance with the Law

Independent Contractor agrees that it will comply with all applicable laws, statutes, rules, regulations, or orders of any country, state or political subdivision thereof, and upon request by BOOMI, will furnish satisfactory evidence or compliance therewith.

## 15. Safety Policies of BOOMI or BOOMI Clients

Independent Contractor shall abide by all written safety, security and office rules and procedures implemented by BOOMI or BOOMI Clients while performing the Services.

## 16. Merger: Entire Agreement

The parties acknowledge that neither of them have made any representations with respect to the subject matter of this Agreement nor any representations including its execution and delivery except such representations as are specifically set forth herein. This Agreement supersedes any prior understandings or agreements between the parties and constitutes the entire understanding between them, except that the Separation Agreement and the Shareholders' Agreement (as modified by the Separation Agreement) expressly survive this Professional Services Agreement and shall continue with full force and effect.

## 17. Right of Set-Off

Any obligation of Independent Contractor to BOOMI arising under this Agreement may be satisfied by exercise of a right of set-off by BOOMI, in BOOMI's sole discretion and in addition to all other rights and remedies available to BOOMI at law, in equity or hereunder, against any amounts that are owed or may be owed to Independent Contractor by BOOMI.

**In the WITNESS WHEREOF, and intending to be legally bounded hereby, the parties execute this Agreement as of date set forth herein above.**

**Boomi, Inc.**
**By: Chief Executive Officer**

_Michael A. West_ (signature)

**Michael A. West**

(signature)

**Independent Contractor**
**Brian Mozhdehi**

Date  2/23/04

Date  2/20/2004

**EXHIBIT A**
**SCOPE OF WORK**

This Scope of Work form is referenced as Exhibit "A" to the Agreement dated **February 20, 2004** between BOOMI and Independent Contractor.

**Independent Contractor**
Name:  **Brian Mozhdehi**                                     Start Date:  **March 1, 2004**

The commencement date as stated above and as listed in Section 2 of this contract shall become valid upon approval of independent contractor by Client of BOOMI and upon approval of working permits for independent contractor.

**Rates for Independent Contractor:**

**75%** of the client daily bill rate or hourly bill rate that is collected by BOOMI.

**Travel:**
Extensive travel may be required.

**Payment Terms to Independent Contractor:**
Terms are NET 10 days, payable from receipt of client payment for Services rendered

**Other Reimbursement by Client of BOOMI to Independent Contractor:**
Business expenses are paid by BOOMI, if applicable, directly to the independent contractor.

**Specific Description of Project:**

The Boomi project work includes the following responsibilities / activities:
(additional responsibilities will be at the discretion of BOOMI and will be amended to the following list)

        * Project & End User Documentation
        * Testing & Scripting
        * Functional and/or Technical Consulting Support
        * General Consulting Support
        * Client Consultation and Communication

_____    2-23-04            _____    2/20/2004
Boomi, Inc.                 Date               Independent Contractor     Date
Michael A. West                                Brian Mozhdehi
Chief Executive Officer

**Exhibit C**

## EXHIBIT A – GENERAL RELEASE

**THIS GENERAL RELEASE**, entered into this 29th day of February, 2004, is executed by **Brian Mozhdehi** ("Mr. Mozhdehi"), a former employee of **Boomi, Inc.** ("Boomi" or the "Company"), a Pennsylvania corporation with its principal place of business at 625 W. Ridge Pike, Building E, Suite 201, Conshohocken, PA 19428.

**WHEREAS**, on February 20th, 2004, Mr. Mozhdehi and the Company entered into a Separation Agreement and General Release providing for the termination of Mr. Mozhdehi's employment effective February 29, 2004 ("Separation Agreement");

**WHEREAS**, in consideration for the Severance Amount described in that Separation Agreement, Mr. Mozhdehi agreed to execute this General Release;

**NOW, THEREFORE,** Mr. Mozhdehi avers as follows:

In consideration for the Severance Amount described in Paragraph 2.d of the Separation Agreement, Mr. Mozhdehi hereby **REMISES, RELEASES, AND FOREVER DISCHARGES** the Company, its present and past parents, subsidiaries and affiliates, successors and assigns, and their respective present or past officers, directors, shareholders, employees, agents and insurers (collectively, the "Company Released Parties") of and from any and all manner of actions and causes of action, suits, debts, claims and demands whatsoever in law or in equity, which he ever had, now have, or hereafter may have, or which his heirs, executors or administrators hereafter may have, by reason of any matter, cause, or thing whatsoever from the beginning of his employment with the Company until the execution date of this Agreement, and particularly, but without limitation of the foregoing general terms, any claims arising under the Employment Agreement, the August 2001 Agreement, and/or the Shareholders' Agreement, and any claims concerning or relating in any way to his employment relationship or the termination of his employment relationship with the Company, including any claims arising under Title VII of the Civil Rights Act of 1964 (as amended by the Civil Rights Act of 1991), the Americans With Disabilities Act, the Rehabilitation Act of 1973, the Equal Pay Act, the Fair Labor Standards Act, the Older Workers Benefits Protection Act, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act, the Pennsylvania Human Rights Act, the Pennsylvania Wage Payment and Collection Act, or any other federal, state or local law, ordinance, regulation, rule or executive order, and any common law claims now or hereafter recognized, including all claims, matters and issues which he could have asserted against the Company Released Parties in any legal, administrative or other proceeding, including any claim for attorneys' fees or costs.

**IN WITNESS WHEREOF**, and intending to be legally bound, Mr. Mozhdehi hereby executes the foregoing General Release.

Signature: _____
Brian Mozhdehi

Date:        February 29, 2004

**Exhibit D**

## <u>SETTLEMENT AGREEMENT AND MUTUAL RELEASE</u>

This Settlement Agreement and Mutual Release ("<u>Agreement</u>") is made and entered into this ___ day of ____ 2005 ("<u>Effective Date</u>"), by and between Boomi, Inc., maintaining its offices at 625 West Ridge Pike, Building E, Suite 201, Conshohocken, PA 19428 ("Boomi" or the "Company"), on the one hand, and Brian Mozhdehi, residing at 746 Bainbridge Street, Philadelphia, PA 19147 ("Mr. Mozhdehi") and CodeUtility, LLC, a company owned and controlled by Mr. Mozhdehi ("CodeUtility"), on the other hand.

**WHEREAS**, Mr. Mozhdehi was formerly employed by Boomi as its Chief Executive Officer;

**WHEREAS**, on August 29, 2001, Mr. Mozhdehi and the Company entered into a Shareholders' Agreement ("<u>Shareholders' Agreement</u>") under which Mr. Mozhdehi acquired ownership of certain Securities, as defined in that Agreement ("<u>Securities</u>");

**WHEREAS**, on February 20, 2004, Mr. Mozhdehi and the Company entered into a Separation Agreement and General Release containing, among other things, restrictive covenants of confidentiality, non-competition and non-solicitation ("<u>Separation Agreement</u>");

**WHEREAS**, on February 20, 2004, Mr. Mozhdehi entered into a Professional Services Agreement in which Mr. Mozhdehi reaffirmed his obligations under the Separation Agreement, including his obligations under restrictive covenants of confidentiality, non-competition and non-solicitation ("<u>Professional Services Agreement</u>");

**WHEREAS,** in August of 2004, Mr. Mozhdehi entered into a First Amendment to the Separation Agreement, which modified the consideration Mr. Mozhdehi received under the Separation Agreement but otherwise provided that said Agreement would continue in full force and effect;

**WHEREAS,** on or about October 25, 2004, Boomi notified Mr. Mozhdehi that it had reason to believe that he had violated the restrictive covenants of confidentiality, non-competition and non-solicitation contained in the Separation Agreement and Professional Services Agreement;

**WHEREAS,** the parties mutually desire to resolve their differences in order to avoid the continued expense and risks associated with litigation; and

**WHEREAS,** neither party admits to liability or wrongdoing of any sort;

**NOW, THEREFORE, IT IS HEREBY AGREED,** by and between the parties, that:

1.      For and in consideration of Boomi's undertakings as set forth herein, Mr. Mozhdehi hereby:

   a.      represents that he has destroyed the load planning application source code, object code and executable developed by Boomi for Saddle Creek Corporation ("<u>SCC</u>") and any derivative thereof in his and CodeUtility's possession, custody or control, and that he has returned all other <u>Company Property</u> and <u>Confidential Information</u> (as those terms are defined in the Separation Agreement) in his and CodeUtility's possession, custody or control;

    b.     represents that he and CodeUtility and anyone acting at his/its direction will not market, sell or otherwise use any Confidential Information or intellectual property belonging to Boomi, including but not limited to the SCC load planning application source code, object code and executable;

    c.     reaffirms his contractual obligations set forth in the Separation Agreement and Professional Services Agreement, including but not limited to his obligations under restrictive covenants of confidentiality, non-competition and non-solicitation;

    d.     acknowledges that Boomi provided written notice of the termination of the Professional Services Agreement on October 25, 2004;

    e.     agrees to provide a sworn affidavit which identifies the entity for which he presently works and presently intends to work for the next four months provided that sufficient employment is available to him at such employer; and

    f.     agrees to take all actions necessary to return all of his Securities to Boomi at the cost of zero dollars ($0.00), including execution of the Share Purchase Agreement which is attached as Exhibit A hereto.

2.    Subject to the terms and conditions of this Agreement, Boomi, for and in consideration of the undertakings and representations of Mr. Mozhdehi and CodeUtility set forth herein, and intending to be legally bound, does hereby REMISE, RELEASE, AND FOREVER DISCHARGE Mr. Mozhdehi and CodeUtility, and their respective officers, directors and attorneys, from all causes of action, suits, debts, claims and demands whatsoever in law or equity, that Boomi ever had, now has, may have had, or hereafter may have by reason of any matter, cause, or thing whatsoever, occurring at any time in the past up to and including the Effective Date. Any and all causes of action relating to a breach of this Agreement are not released and are specifically reserved. It is understood that Boomi would not have entered into this Agreement without the representations and commitments by Mr. Mozhdehi in paragraph 1 herein. Upon a breach of any of these representations or commitments by Mr. Mozhdehi, Boomi shall be entitled to assert any causes of action that it had at the time the parties executed the Agreement, in addition to any causes of action that Boomi may have relating to a breach of this Agreement.

3.    Subject to the terms and conditions of this Agreement, Mr. Mozhdehi and CodeUtility, for and in consideration of the undertakings of Boomi set forth herein, and intending to be legally bound, does hereby REMISE, RELEASE, AND FOREVER DISCHARGE Boomi, and its officers, directors and attorneys, from all causes of action, suits, debts, claims and demands whatsoever in law or equity, that Mr. Mozhdehi and CodeUtility ever had, now has, may have had, or hereafter may have by reason of any matter, cause, or thing whatsoever, occurring at any time in the past up to and including the Effective Date. Any and all claims relating to a breach of this Agreement are not released and are specifically reserved.

2

4.     Mr. Mozhdehi and CodeUtility agree that they shall not make any statement, either written or oral, or convey any information about Boomi which is disparaging or which in any way reflects negatively upon it, and Boomi agrees that it shall not make any statement, either written or oral, or convey any information about Mr. Mozhdehi or CodeUtility which is disparaging or which in any way reflects negatively upon them. However, nothing in this paragraph shall be construed to prohibit any party from disclosing the existence or terms of this Agreement or the facts that gave rise to Boomi's October 25, 2004 letter or this Agreement to a third party, or from producing and/or relying upon this Agreement in a judicial or administrative proceeding.

5.     This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania without regard to conflict of laws or choice of law principles.

6.     If any provision or portion of this Agreement is determined to be invalid, illegal or unenforceable in whole or in part, and such determination becomes final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portions of this Agreement enforceable, and this Agreement as thus amended shall be enforced to give effect to the intention of the parties insofar as that is possible.

7.     None of the parties to this Agreement shall be considered to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

8.     This Agreement sets forth the entire agreement between the parties and fully supersedes all other oral and written understandings or agreements between the parties pertaining to the subject matter of this Agreement, with the exception of the Separation Agreement, the First Amendment and the Professional Services Agreement, which shall remain in full force and effect. The terms of this Agreement are contractual and not mere recitals.

9.     The obligations recited and undertaken in this Agreement shall be binding on the parties and their respective successors and assigns.

10.     The parties shall be exclusively responsible for their own respective costs and attorneys' fees.

11.     A copy of this Agreement shall be considered as valid and binding as an original.

12.     Any notice or other communication under this Agreement shall be in writing and shall be deemed duly given upon receipt if it is addressed to each of the intended recipients identified below and personally delivered, sent by registered or certified mail (postage prepaid), sent by confirmed facsimile, or delivered by a reputable express overnight courier:

3

If to Boomi:

> Boomi, Inc.
> 625 West Ridge Pike
> Building E, Conshohocken, PA 19428

If to Mr. Mozhdehi and/or CodeUtility, LLC:

> Brian Mozhdehi
> 746 Bainbridge Street
> Philadelphia, PA 19147

**IN WITNESS WHEREOF**, and intending to be legally bound herein, Boomi, Inc., Brian Mozhdehi and CodeUtility, LLC hereby willingly and knowingly execute this Settlement Agreement and Mutual Release.

By: _____

**BRIAN MOZHDEHI**

Date: _____

By: _____

**BRIAN MOZHDEHI, PRESIDENT**

**CODEUTILITY, LLC**

Date: _____

By: _____

**MIKE WEST, PRESIDENT**

**BOOMI, INC.**

Date: _____

4

# SHARE PURCHASE AGREEMENT

Share Purchase Agreement (this "Agreement"), dated _____, 2005, between BOOMI, INC., a Pennsylvania corporation ("Boomi"), and BRIAN MOZHDEHI (the "Shareholder"), a holder of 1,650,000 shares (the "Shares") of Common Stock, par value $0.001 per share, of Boomi.

**WHEREAS**, in or about April of 2002, Boomi and the Shareholder entered into an Employment Agreement providing for the Shareholder to serve as Chief Executive Officer of Boomi pursuant to certain terms and conditions (the "Employment Agreement");

**WHEREAS**, on February 20, 2004, Boomi and the Shareholder entered into a Separation Agreement and General Release providing that the Shareholder's employment relationship with Boomi was permanently and irrevocably severed (the "Separation Agreement");

**WHEREAS**, concurrent with the execution of this Agreement, Boomi and the Shareholder will enter into a Settlement Agreement and Mutual Release (the "Settlement Agreement") to resolve differences between the parties relating to paragraph 7.a. of the Separation Agreement and, pursuant to Section 1.f. of that Settlement Agreement, the Shareholder agrees to sell all of his Shares to Boomi;

**NOW, THEREFORE**, in consideration of, and reliance upon, the respective covenants, representations, warranties and agreements herein contained, and intending to be legally bound, it is hereby agreed as follows:

## ARTICLE I - The Sale

1.1     The Sale.  The Shareholder hereby sells to Boomi, and Boomi hereby purchases from the Shareholder, all of the Shares, for a price per share of $ 0.00, or an aggregate purchase price of $0.00 (the "Purchase Price").

1.2     Closing Actions.  The Shareholder shall deliver the Shares to Boomi, either duly endorsed or accompanied by a duly executed stock power in substantially the form of Exhibit A hereto.

1.3     The Closing.  The closing of the sale of the Shares shall be deemed to be completed on the date hereof.

## ARTICLE II - Representations and Warranties

Each party to this Agreement shall be deemed to have given only those representations and warranties which are expressly set forth herein with respect to such party, and no other representations and warranties shall be implied from anything set forth herein.

2.1     Representations and Warranties of the Shareholder.  The Shareholder hereby represents and warrants to Boomi as follows:

2.1.1   <u>Ownership of Shares</u>.  The Shareholder is the lawful owner of the Shares free and clear of all pledges, liens, encumbrances, claims and other charges of any kind, including, without limitation, any agreements, subscriptions, options, warrants, calls, commitments or rights of any character granting to any person any interest in or right to acquire from the Shareholder at any time or upon the happening of any stated event, any Shares, other than the rights of Boomi pursuant to this Agreement.  The Shares constitute all of the shares of Boomi Common Stock owned by the Shareholder.

2.1.2   <u>Authority Relative to this Agreement</u>.  The Shareholder is not subject to or obligated under any contract provision or other agreement, or subject to any order or decree, which would be violated by his executing and carrying out this Agreement.  No authorization, consent or approval of any governmental or private self-regulatory body or authority is necessary for the consummation by the Shareholder of the transactions contemplated hereby.

2.1.3   <u>Investment Experience</u>.  The Shareholder is an experienced investor in securities, was the Chief Executive Officer of Boomi from April of 2002 to February 29, 2004 and acknowledges that he is able to fend for himself, can bear the economic risk of his decision to sell the Shares hereunder and has such knowledge and experience in financial or business matters that he is capable of evaluating the merits and risks of such sale.  The Shareholder believes he has received all the information considered by him to be necessary or appropriate for deciding whether to sell the Shares.

2.2   <u>Representations and Warranties of Boomi</u>.  Boomi hereby represents and warrants to the Shareholder as follows:

2.2.1   <u>Organization</u>.  Boomi is a corporation duly incorporated, validly existing and in good standing under the laws of Pennsylvania and has all necessary corporate power to carry on its business as it is now being conducted.

2.2.2   <u>Authority Relative to this Agreement</u>.  Boomi has the corporate power and authority to enter into this Agreement and to carry out its obligations hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by the Board of Directors of Boomi, and no other corporate proceedings on the part of Boomi are necessary to authorize this Agreement and the transactions contemplated hereby. Boomi is not subject to or obligated under any charter, bylaw or contract provision or other agreement or any license, franchise or permit, or subject to any order or decree, of any nature whatsoever, which would be violated by its executing and carrying out this Agreement.  No authorization, consent or approval of any governmental or private self-regulatory body or authority is necessary for the consummation by Boomi of the transactions contemplated hereby.

2.3   <u>Survival of Representations</u>.  All representations and warranties of each party shall survive the Closing and, notwithstanding any investigation conducted before or after the Closing or the decision of any party to complete the Closing, the parties hereto shall be entitled to rely upon the representations and warranties set forth herein.

2

ARTICLE III - General Provisions

3.1    Brokers' and Finders' Fees. Each of the Shareholder and Boomi represents and warrants to the other that all negotiations relating to this Agreement have been carried on by him or it directly without the intervention of any person, firm, corporation or entity who or which may be entitled to any brokerage fee or other commission in respect of the execution of this Agreement or the consummation of the transactions contemplated hereby, and each agrees to indemnify and hold the other harmless against any and all claims, losses, liabilities or expenses which may be asserted against the other as a result of such first party's dealings, arrangements or agreement with any such person, firm, corporation or entity.

3.2    Expenses. Each party hereto shall pay his or its own expenses incidental to this Agreement and the consummation of the transactions contemplated hereby.

3.3    Contents of Agreement; Parties in Interest. Etc. This Agreement sets forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby. It shall not be amended or terminated except by written instrument duly executed by each of the parties hereto. Any and all previous agreements and understandings between parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

3.4    Assignment and Binding Effect. This Agreement may not be assigned by either party hereto without the prior written consent of the other. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the heirs and permitted assigns of the Shareholder and by Boomi and its successors and permitted assigns.

3.5    Waiver. Any term or provision of this Agreement may be waived at any time by the party entitled to the benefit thereof by a written instrument executed by such party; provided, however, that no other action taken by either party shall be deemed to constitute a waiver or compliance with any representation, warranty, covenant or agreement of the other party contained in this Agreement. The waiver by either party of a breach of any provision of this Agreement shall not be construed as a waiver of any subsequent breach.

3.6    Governing Law and Consent to Jurisdiction. This Agreement shall be governed by, and interpreted and enforced in accordance with, the laws of the Commonwealth of Pennsylvania.

3.7    No Benefit to Others. The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and their respective heirs, successors and permitted assigns, and they shall not be construed as conferring and are not intended to confer any rights on any other persons.

3.8    Section Headings and Gender. All section headings and the use of a particular gender are for convenience only and shall in no way modify or restrict any of the terms or provisions hereof.

3.9    Exhibits. All exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

3.10    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and each of the Shareholder and Boomi may become a party

3

hereto by executing a counterpart hereof. This Agreement and any counterpart so executed shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed this Agreement on the date first written.

BOOMI, INC.

By:_____
    Name:
    Title:

THE SHAREHOLDER


_____
Brian Mozhdehi

4

**Exhibit A**

## STOCK POWER

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____, a _____ corporation (the "Company"), an aggregate of

_____ (_____) shares of Common Stock, par value $_____ per share, of the

Company standing in the name of the undersigned on the books of said corporation, represented by

certificate number _____, and does hereby irrevocably constitute and appoint

_____ to transfer said shares of capital stock of said corporation on the

books of said corporation with full power of substitution in the premises.


Dated: _____, 2005                         _____

                                            Name:

**Exhibit B**

## AFFIDAVIT OF LOSS

The undersigned, (the "Shareholder"), being duly sworn, deposes and says as follows:

1.      The Shareholder is the holder of _____ shares of Common Stock, par value of $_____ per share (the "Shares"), of _____ (the "Company") that are represented by Certificate No. _____ (the "Certificate").

2.      The Certificate has been lost or mislaid.

3.      The Shareholder has made a diligent search for the Certificate and has been unable to find or recover the same.

4.      The Shareholder has not sold, negotiated, discounted, delivered, assigned, pledged, transferred, deposited under any agreement or hypothecated the Certificate or the Shares, or any interest therein, signed any power of attorney, endorsement or authorization with respect thereto, or otherwise disposed of the Certificate or the Shares, or any interest therein.  No person, corporation, partnership, firm or association other than the Shareholder has or has asserted any right, title, claim or interest in, to or respecting the Certificate or the Shares, or the proceeds thereof.  The Shareholder is entitled to the full and exclusive possession of the Certificate.

5.      The Shareholder hereby requests, and this Affidavit of Loss is made for the purpose of inducing, the Company to deem the Certificate as surrendered and to issue a replacement certificate as replacement for the Certificate (the "Replacement Certificate").  If the Certificate is found or recovered, the Shareholder will immediately surrender the same to the Company, its successors and assigns, for cancellation without requiring any consideration or other payment therefor.

6.      In consideration of the issuance of the Replacement Certificate, the Shareholder will indemnify and hold harmless the Company and its successors and assigns, from and against any and all claims, actions, suits or other proceedings brought or alleged, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, judgments, costs, charges, expenses (including, without limitation, attorneys' fees and disbursements) and payments of every nature and character suffered or incurred, whether or not by reason of inadvertence, accident, oversight or negligence on the part of the Shareholder by reason of any claim or demand with respect to the Certificate or the issuance of the Replacement Certificate.

7.      The above statements are true and correct to the best of my knowledge, information and belief.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Affidavit of Loss on _____, 2005.

SHAREHOLDER

_____
Name:

STATE OF                                    }
                                            }        ss.:
COUNTY OF                                   }

      On this ____ day of _____, _____, before me personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes therein contained.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.


(NOTARIAL SEAL)

                          Notary Public

                          My Commission Expires:

1-PH/2210695.3

**Exhibit E**

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

**TX 6-210-253**

EFFECTIVE DATE OF REGISTRATION

9   19   2005

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**
Booms Load Planner

**PREVIOUS OR ALTERNATIVE TITLES ▼**
N/A

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   **Title of Collective Work ▼**
N/A

If published in a periodical or serial give   **Volume ▼**   **Number ▼**   **Issue Date ▼**   **On Pages ▼**
N/A

## 2

**a**   **NAME OF AUTHOR ▼**
Booms Inc

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶ Pennsylvania

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes   ☑ No
Pseudonymous?   ☐ Yes   ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Computer program

**NOTE**
Under the law, the author of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was made for hire check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**   **NAME OF AUTHOR ▼**
N/A

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes   ☐ No
Pseudonymous?   ☐ Yes   ☐ No

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**   **NAME OF AUTHOR ▼**
N/A

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes   ☐ No
Pseudonymous?   ☐ Yes   ☐ No

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

## 3

**a**   **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
2004 ◀ Year

**b**   **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ 01   Day ▶ 30   Year ▶ 2004   Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Booms, Inc
625 West Ridge Pike Building E Suite 201 Conshohocken PA 19428

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼
N/A

**APPLICATION RECEIVED**
SEP 19 2005
**ONE DEPOSIT RECEIVED**

**TWO DEPOSITS RECEIVED**
SEP 19 2005
**FUNDS RECEIVED**

---

**MORE ON BACK ▶** Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
See detailed instructions.   Sign the form at line 8.

**DO NOT WRITE HERE**
Page 1 of ___ 2 ___ pages

| EXAMINED BY | | FORM TX |
| --- | --- | --- |
| CHECKED BY | | |
| CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET**

## 5
**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☑ No  If your answer is Yes why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is Yes, give: Previous Registration Number ▶               Year of Registration ▶

## 6
**DERIVATIVE WORK OR COMPILATION**
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

N/A

**a**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

N/A

**b**

## 7
**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                          Account Number ▼

N/A

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼

McCausland, Keen & Buckman
c/o Paula T Bradley  Paralegal
Radnor Court, Suite 160, 259 N Radnor Chester Road, Radnor PA 19087

**b**

Area code and daytime telephone number ▶ (610) 341 1052        Fax number ▶ (610) 341 1099
Email  pbradley@mkbattorneys com

## 8
**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  Boom Inc
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Paula T  Bradley                                      Date ▶ 09/13/2005

Handwritten signature (X) ▼

X _____ *Paula T Bradley* _____

## 9
Certificate will be mailed in window envelope to this address

Name ▼
McCausland, Keen & Buckman  Attention  Paula T Bradley Paralegal

Number/Street/Apt ▼
Radnor Court, Suite 160  259 N Radnor Chester Road

City/State/ZIP ▼
Radnor PA 19087

*17 U S C § 506(e) Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.*

Rev July 2003—xxx   Web Rev July 2003   ☺ Printed on recycled paper          U S Government Printing Office  2003–xxx  11 000 001